Argued and submitted April 4, judgment reversed and remanded; order
allowing plaintiff to amend complaint to request punitive damages affirmed as
to defendants Scott J. Rein and Dressler, Rein, Evans and Sestanovich, LLP, and
reversed as to defendants Stuart I. Teicher and Sussman, Shank, Wapnick,
Caplan & Stiles, LLP, September 26, 2007

Kenneth R. PERRY,
*Plaintiff-Appellant,*

*v.*

Scott J. REIN;
Dressler, Rein, Evans and Sestanovich, LLP,
a California limited liability partnership;
Stuart I. Teicher
and Sussman, Shank, Wapnick, Caplan & Stiles, LLP,
an Oregon limited liability partnership,
*Defendants-Respondents.*

Multnomah County Circuit Court
000909797; A126163

168 P3d 1163

Linda K. Williams argued the cause for appellant. With her on the briefs was Kafoury & McDougal.

Richard J. Stone argued the cause for respondents Scott J. Rein and Dressler, Rein, Evans and Sestanovich LLP. With him on the briefs were Brad T. Summers, Robert W. Wilkinson, and Ball Janik LLP.

David C. Landis argued the cause and filed the briefs for respondents Stuart I. Teicher and Sussman, Shank, Wapnick, Caplan & Stiles, LLP.

Before Schuman, Presiding Judge, and Edmonds and Ortega, Judges.

EDMONDS, J.

Ortega, J., concurring.

**EDMONDS, J.**

Plaintiff, an attorney, appeals a judgment dismissing his claims for wrongful initiation of civil proceedings. Those claims allege that defendants, attorneys Rein and Teicher and their respective law firms, prosecuted an action against him in federal court without probable cause and with an improper purpose. The trial court granted defendants' motions for summary judgment on the ground that plaintiff failed to demonstrate a genuine issue of material fact as to whether the federal action was terminated in his favor. ORCP 47 C. Defendants cross-assign as error the trial court's order allowing plaintiff to amend his complaint to request punitive damages. We reverse and remand the judgment and reverse in part the order allowing plaintiff to amend his complaint to request punitive damages.

## I. BACKGROUND

The summary judgment record in this case is, to some measure, an outgrowth of its procedural history, including an earlier appeal, *Perry v. Rein*, 187 Or App 572, 71 P3d 81 (2003) (*Perry I*). Plaintiff commenced this action in 2000, alleging that defendants had, on behalf of their client, DeAbate, wrongfully initiated an action in federal court in the District of Oregon that named him as a defendant on the theory that he was part of a scheme to defraud DeAbate of $1 million. Plaintiff's complaint further alleges that defendants initiated the action without probable cause and with a purpose other than to secure adjudication of the claims against him. Defendants moved for summary judgment on plaintiff's claims on various grounds, including that the federal action had not terminated in plaintiff's favor, that defendants had probable cause for bringing the federal action, and that plaintiff had not demonstrated that defendants acted with malice. The trial court granted the motion on the ground that plaintiff failed to demonstrate that defendants lacked probable cause and did not reach the other issues.

Plaintiff appealed that ruling. On appeal, we summarized the facts in the light most favorable to plaintiff. Because that factual summary provides relevant background for purposes of the present appeal, we quote it at length:

"The somewhat complex web of facts of this case began in 1999, when plaintiff agreed to represent Mac Obioha (Obioha) on a civil matter. At the time, Obioha was in a federal prison in California. On October 5, 1999, Ann DeAbate (DeAbate), through her attorney, defendant Scott Rein (Rein), filed an action in the United States District Court in Connecticut seeking to recover $1 million of DeAbate's funds that allegedly had been wrongfully converted by Obioha, one of his associates, Michael Boyd (Boyd), and various other individuals. DeAbate had deposited the money into an offshore bank account for investment purposes, and, at some point, the money was removed from her account. At least some of that money, after it was removed from DeAbate's account, was deposited into Boyd's bank account. The Connecticut federal court issued a temporary restraining order (TRO) that same day, restraining Boyd and the other individuals from moving, transferring, or withdrawing any monies from their bank accounts.

"The same day that DeAbate filed the action and the Connecticut federal court issued the TRO, Boyd wired $150,000 to plaintiff for purposes related to his representation of Obioha on a matter that was unrelated to the DeAbate matter. It is unclear whether the money was wired before or after Boyd was served with the TRO. However, after a telephone conference with Rein, Boyd agreed to reverse the wire transfer. When it was learned that Boyd could not reverse the transfer, Rein called plaintiff on the morning of October 6. Plaintiff confirmed that he represented Obioha and that he had received the $150,000 from Boyd. Rein demanded that plaintiff return that money promptly. According to plaintiff, he told Rein that he had contacted the Oregon State Bar and the Professional Liability Fund to seek advice regarding his legal and ethical obligations concerning the disposition of the funds and that he was awaiting instructions from the Bar. He said that he would contact Rein after he had received guidance from the Bar. In his deposition, Rein testified that plaintiff refused to return the money in his account or to give any assurances that he would not disburse it. In an affidavit in the summary judgment record, Rein averred that plaintiff refused to reverse the wire transfer or to agree to freeze the funds until plaintiff had an opportunity to speak to the Bar.

"At some point later that day, Rein again contacted plaintiff by telephone. According to plaintiff, he told Rein

that he had received advice from the Bar and that he had been advised to contact his client and then respond to Rein's proposals regarding disposition of the funds by the end of the day on October 7 or the morning of October 8 at the latest. Rein averred in his affidavit that, in the second conversation, plaintiff 'simply reiterated his previous statement' and refused to agree to return the money.

"Plaintiff contacted his client and then called Rein and defendant Teicher, DeAbate's Oregon counsel, on October 7. He advised them that he was making arrangements to have the money sent back. On that same day, defendants filed a complaint in federal district court in Oregon on behalf of DeAbate, alleging that plaintiff had conspired to defraud DeAbate of $1 million, that he had converted no less than $1 million of DeAbate's funds, and that he had been unjustly enriched in that same amount. The complaint requested that a constructive trust be imposed on the $150,000 that plaintiff had received and on the $1 million that defendants alleged plaintiff had converted.

"On that same day, defendants also obtained a temporary restraining order, an order to show cause why the court should not issue a preliminary injunction, and a writ attaching the sum of $150,000 in plaintiff's bank account. In support of those requested remedies, defendants represented to the court that their restraining order and injunction requests were 'founded upon the undisputed fact that the funds which [plaintiff] is holding are [DeAbate] funds to which he is a constructive trustee[.]' The order to show cause, in relation to plaintiff, stated that plaintiff was required to appear and to show cause why the court should not issue an injunction preventing him from disbursing the $150,000. On or about October 12, plaintiff gave instructions to his bank to return the $150,000 to Connecticut. A hearing on the show cause order was held on October 19 * * *.

"The following month, the matter was settled between Boyd, Obioha, and DeAbate. Pursuant to the terms of that settlement, Boyd returned DeAbate's money, and DeAbate filed an amended complaint in the Oregon action; as part of that complaint, DeAbate dropped all claims against plaintiff except the claim for a constructive trust. The complaint continued to allege that plaintiff held $150,000 of DeAbate's funds. The settlement agreement also mandated that the amended complaint be dismissed against Boyd and

Obioha with prejudice and against plaintiff, but without prejudice. At no time was plaintiff ever a party to settlement negotiations or the final settlement itself. One day after filing the amended complaint, the Oregon federal district court dismissed the action against plaintiff."

187 Or App at 574-77.

After summarizing the facts, we proceeded in *Perry I* to determine whether, on the record before the trial court, there existed a genuine issue of material fact as to whether defendants initiated the federal action without probable cause. Based on the record before us, we concluded that there was "no evidence in the record from which it [could] be inferred that defendants *reasonably* believed that plaintiff was involved in the alleged original scheme to defraud DeAbate of her funds." *Id.* at 580 (emphasis in original). Thus, we held that the trial court erred in granting summary judgment to defendants on that ground. *Id.*

We next turned to the question of whether the federal action terminated in favor of plaintiff. Although the trial court did not reach that question, defendants urged us to reach it as an alternative basis for affirmance. The question was complicated, we explained, because the federal action was "terminated as a result of a settlement to which plaintiff was not a party and that resulted in a voluntary dismissal without prejudice of the action against him." *Id.* at 582. We further explained that, under Oregon law,

> " 'the voluntary dismissal of an underlying action before a trial on the merits is favorable to the defendant if it reflects adversely on the merits of the underlying action. That determination does not necessarily depend on whether the dismissal was with, or without, prejudice. Instead, it requires an examination of the circumstances resulting in the termination.' "

*Id.* (quoting *Portland Trailer & Equipment v. A-1 Freeman Moving*, 182 Or App 347, 356, 49 P3d 803 (2002)).

"For instance, a voluntary termination may occur because the underlying claim lacked merit. On the other hand, a proceeding is not terminated in favor of a plaintiff *when the action is terminated because of financial considerations,*

> *such as a party's belief that the potential recovery did not justify the cost of the litigation."*

187 Or App at 583 (emphasis added; citation omitted).

Applying those principles to the record then before us, we concluded that the record gave rise to competing inferences regarding defendants' motivations for settling the federal action, thus precluding summary judgment:

> "After plaintiff returned the $150,000, the other parties involved in the lawsuit negotiated to return all of DeAbate's funds to her. In return, DeAbate entered into a settlement agreement under which she agreed to dismiss the complaint as to all defendants, including plaintiff. Plaintiff was not required to give any consideration for the settlement, even though he ultimately benefitted from it. *Those circumstances do not establish as a matter of law that the underlying proceeding terminated in favor of plaintiff as that requirement has been interpreted by the case law.* One reasonable inference that can be drawn from the summary judgment record is that the dismissal as to plaintiff occurred because there was no reason to continue to believe that he was in any way involved in a scheme to conspire to defraud DeAbate of her money. If that inference is drawn from defendants' actions, then the claim was terminated in favor of plaintiff. *On the other hand, it can also be inferred from the summary judgment record that the case was dismissed because the wrongdoers returned DeAbate's money to her and therefore any continuation of the case against plaintiff would not be financially prudent or for some other reason.*[4] If that was the motivation for the settlement, then plaintiff would be unable to demonstrate a favorable termination. The existence of both inferences precludes summary judgment.
>
> ---
>
> "[4] At trial, the court should make its own legal determination as to what facts do or do not constitute a favorable termination based on the record before it."

*Id.* at 583 (emphasis added). Accordingly, we reversed the grant of summary judgment and remanded the case to the trial court.

On remand, defendants filed a second motion for summary judgment, this time aimed at the factual issues

that we identified in our opinion. Defendants submitted affidavits from defendant Rein and Alfred Pavlis, two of the attorneys involved in the settlement of the federal action. In his affidavit, Rein averred, in part,

"9. On October 14 and 15, 1999, I participated in settlement conferences with Mr. Pavlis at the Connecticut offices of Shipman & Goodwin, LLP, Boyd's attorneys in the Connecticut case. At or about this same time, I also engaged in settlement negotiations with Obioha. At the time these settlement discussions commenced, the status of DeAbate's stolen funds was as follows: (a) Perry had returned the $150,000 wired to him by Boyd to Boyd's bank account in Connecticut; (b) Boyd's bank account now held $400,000 that was subject to the Connecticut federal court's emergency Orders; (c) Jackson had returned $400,000 directly to DeAbate from the Swiss bank account; and (d) $600,000 had completely disappeared.

"10. On November 12, 1999, Obioha agreed to pay $90,000 to DeAbate under the terms of a Promissory Note. A true copy of the letter confirming this settlement between DeAbate and Obioha is attached hereto as Exhibit 138. Obioha paid off the $90,000 due under his Promissory Note in March 2000 * * *.

"11. On or about November 15, 1999, a Settlement Agreement and Mutual Release was signed by DeAbate and Boyd (the 'Boyd Settlement Agreement'). The Boyd Settlement Agreement was approved as to form and content by me, as attorney for DeAbate, and by Lewis G. Schwartz, as attorney for Boyd. * * * I discussed with Mr. Pavlis the relative merits of the proposed settlement before it was executed.

"12. The Boyd Settlement Agreement included the following provisions:

"(a) Paragraph 1 required Boyd to pay to DeAbate a total of $910,000 in cash upon closing of the settlement.

"(b) Paragraph 2 required DeAbate to provide to Boyd, 'simultaneous with the execution of this Agreement * * * fully executed First Amended Complaints * * *.'

"(c) Paragraph 3 required Boyd and DeAbate to file a Stipulated Motion to Dissolve Prejudgment Remedies '[a]s

soon as practicable after the execution of [the settlement] Agreement.'

"(d) Paragraph 4 required DeAbate to provide to Boyd, 'simultaneous with the execution of this Agreement * * * executed Notices of Dismissal of the Connecticut Action and the Oregon Action in the form attached hereto as Exhibits D and E respectively (the 'Notices of Dismissal').' "

The affidavit also attached a copy of the settlement agreement.

In addition, Rein averred:

"15. [Plaintiff] was not a direct participant in the settlement with Boyd. However, based upon my participation in the settlement discussions leading up to the execution of the Boyd Settlement Agreement, I am certain that Boyd would not have entered into this Agreement if it did not contain the provisions that required the execution and filing of (a) amended complaints in the forms actually filed in the Connecticut and the Oregon district courts; (b) a Stipulated Motion to Dissolve Prejudgment Remedies in the form actually filed in the Connecticut district court; (c) Notices of Dismissal in the form actually filed in the Connecticut and the Oregon district courts; and (d) a covenant not to sue [plaintiff].

"16. The motivation for accepting the Boyd Settlement Agreement was the economic benefit to our client. This settlement allowed DeAbate to recover $910,000 in cash which, combined with $400,000 in cash recovered earlier from Jackson and $90,000 in the form of a Promissory Note obtained by the separate settlement with Obioha, resulted in a 100 percent recovery of the principal amount stolen from DeAbate by the fraudulent scheme. Any attempt to continue the case against [plaintiff] would have caused the Boyd Settlement Agreement to fail, and DeAbate would have lost the 100 percent recovery of her stolen funds achieved through the settlement.

"17. Although [plaintiff] had by this point returned the stolen $150,000 wired to him by Boyd for Obioha, these funds had not been recovered by DeAbate. Good liability claims still existed against [plaintiff] for the stolen $150,000 and, under well-established Oregon joint liability principles, for the entire amount of the $1 million still owed to DeAbate. However, with an assured 100 percent recovery

of the principal amount of her damages, DeAbate no longer had damages to claim other than prejudgment interest from the lost use of her $1.4 million and any allowable litigation costs.

"18. Under these circumstances, I did not think it made economic sense to continue litigation against [plaintiff] and the others for such a relatively insignificant amount of additional money. It was a classic instance of diminishing returns. Accepting the settlement DeAbate assured for DeAbate a 100 percent recovery of her stolen principal with no further loss or expense; continuing the litigation guaranteed the prohibitive expense of litigating two complex fraudulent conspiracy cases in two different federal court jurisdictions.

"19. There was another very important reason why the settlement was the only reasonable economic alternative for DeAbate. On the day the Boyd Settlement Agreement was signed, Boyd's Summit Bank accounts contained only $400,000 that was subject to the Connecticut federal court's emergency Orders. Thus, as of that moment, $600,000 of DeAbate's stolen funds originally wired to Boyd by Jackson from Switzerland had simply disappeared. Including the $90,000 in Obioha's bank account still attached under the Oregon federal court's emergency Order, the emergency Orders we had obtained in Connecticut and Oregon together gave us security against only $490,000 of the $1 million still unrecovered by DeAbate as of that point in time. Thus, assuming that DeAbate prevailed on every one of her claims at trial, which I reasonably believed to be probable, DeAbate nevertheless could count on executing against bank accounts containing less than half of the amount that she actually recovered by going forward with the settlement.

"20. Under these circumstances, I could not in good conscience recommend that our client continue the litigation. Accepting the Boyd Settlement Agreement and all of its terms—including dismissal of the case against Perry as provided in paragraphs 2 through 4 of the Agreement—was the only financially prudent course for DeAbate to follow; continuing the case against Perry would not have been financially prudent. My motivation in accepting the settlements with Boyd and Obioha, and thereby deciding not to continue the litigation against [plaintiff], was entirely

driven by these financial considerations on behalf of our client."

Pavlis's affidavit corroborated some of the averments in Rein's affidavit and stated that, based on his own knowledge of the settlement, he believed that Rein's statements in the paragraphs set forth above were true and correct. Pavlis further averred that "[i]t would not have been financially prudent for us to reject the settlements and continue the litigation. Our decision to accept the settlements—and to dismiss the pending claims—was motivated exclusively by these financial considerations."

In response to the renewed motions for summary judgment, plaintiff did not offer any additional evidence. Rather, he argued that defendants had already litigated the same issue in their previous motions for summary judgment and were therefore barred from relitigating the issue; that Rein's affidavit simply was not credible; and that the record contained ample circumstantial evidence from which a trier of fact could infer that the claims against plaintiff were abandoned because they lacked merit.

The trial court reached the merits of the renewed summary judgment motions[1] and ruled that plaintiff had failed to carry his burden of demonstrating the defendants' motivation for dismissing the federal court action: "The uncontested facts before this court establish that the defendants' motivation for dismissing the case against [plaintiff] was based on the settlement they negotiated with the other defendants which made their client whole." The court further reasoned that,

> "[p]laintiff elected to rely on 'law of the case' as set forth in the Court of Appeals opinion in *Perry v. Rein, supra,* rather than presenting evidence that either called into question the veracity of Rein's statements in his affidavit or demonstrated it was more likely than not that the case against

---

[1] The trial court determined that

"the policy reasons behind ORCP 47 favoring summary adjudication of issues pretrial allow a party to renew a previously denied motion for summary judgment so long as the factual record supporting the new motion is different from the factual record submitted with the previous summary judgment motion; that is the case here."

[plaintiff] was dismissed because defendants believed they could not prevail on the merits of their claim against him."

(Footnotes omitted.) The court then granted defendants' motion and entered judgment against plaintiff.

## II. ANALYSIS

### A. *Summary judgment ruling*

■ In this appeal, plaintiff essentially reprises the arguments he made in the trial court. First, he argues that the "court erroneously disturbed the law of the case" because this court already considered the issue of favorable termination in the previous appeal. We disagree. Our earlier opinion was confined to the particular factual record before us; the record below has changed and, consequently, the issue before us is different from the issue that we decided in *Perry I.*

■ Next, plaintiff argues that the record permits competing inferences as to why the federal action was dismissed, thereby precluding summary judgment. Under Oregon law, the tort of wrongful initiation of civil proceedings has five elements:

"(1) The commencement and prosecution by the defendant of a judicial proceeding against the plaintiff;

"(2) The termination of the proceeding in the plaintiff's favor;

"(3) The absence of probable cause to prosecute the action;

"(4) The existence of malice, or as is sometimes stated, the existence of a primary purpose other than that of securing an adjudication of the claim; and

"(5) Damages."

*Alvarez v. Retail Credit Ass'n*, 234 Or 255, 259-60, 381 P2d 499 (1963) (citations omitted).

■ The second element, termination "in the plaintiff's favor," was the only one at issue in defendants' renewed motion for summary judgment. As discussed above, whether a voluntary dismissal is "favorable" depends on whether "it reflects adversely on the merits of the underlying action." *Portland Trailer & Equipment*, 182 Or App at 356. That

inquiry, we have noted, is "fact-specific." *Id.* In *Portland Trailer & Equipment*, we observed:

> "If the action was voluntarily terminated by the plaintiff, a finder of fact might determine that the termination was an admission that the claim lacked merit. However, the abandonment also might reflect financial impecunity or a determination that potential recovery did not justify the cost of litigation. *Because any number of factual explanations might be at the root of a voluntary dismissal, the question often is not well-suited for resolution on a summary judgment record.*"

*Id.* at 357 (emphasis added).

■ The question before us, then, is whether on this record—now supplemented with the affidavits of Rein and Pavlis—there remains any factual dispute as to whether the termination reflected adversely on the merits of the claims against plaintiff. Defendants argue that, because the affidavits of Rein and Pavlis are uncontested with regard to the reasons for dismissing the federal action, the facts regarding "favorable termination" are undisputed and summary judgment is therefore appropriate. Plaintiff, in turn, argues that (1) Rein's explanation of the reasons for settling the federal action is self-serving and simply not credible; and (2) that the factual circumstances of the settlement give rise to an inference that would permit the jury to disbelieve the explanations of Rein and Pavlis.

■ Initially, we reject plaintiff's argument that summary judgment was improper because a jury could elect to disbelieve the testimony of Rein. Uncontradicted testimony cannot be controverted on summary judgment simply by asserting that it should not be believed. *Blandino v. Fischel*, 179 Or App 185, 192, 39 P3d 258, *rev den*, 334 Or 492 (2002); *see also Tolbert v. First National Bank*, 312 Or 485, 495, 823 P2d 965 (1991) ("[F]lat disbelief * * * is not an inference that plaintiffs may invoke on summary judgment[.]"); *Davis v. County of Clackamas*, 205 Or App 387, 394, 134 P3d 1090, *rev den*, 341 Or 244 (2006) (a plaintiff must do more than impeach an opponent's testimony on an issue on which the plaintiff has the burden of persuasion under ORCP 47).

The more difficult question is whether, in light of the new affidavits, the factual circumstances surrounding the settlement permit a trier of fact to find that defendants dismissed the claims against plaintiff in the belief that the claims lacked merit. Plaintiff points specifically to the facts (1) that the dismissal of the claims against him occurred without his even participating in the settlement and (2) that he did not pay *anything* toward the settlement that resulted in the dismissal. We agree with plaintiff that those facts would permit a trier of fact to infer that defendants dismissed the action in the belief that the claims against him lacked merit. A trier of fact could reasonably infer from the facts that, if defendants had held a good faith belief that plaintiff was liable along with the other parties to the settlement, they would have negotiated with him directly and would have sought a contribution from him to the settlement that would have benefitted their client.[2] Although that inference is not the only inference that can be drawn from the summary judgment record, it is an inference that is available. *Cf. Gowin v. Heider*, 237 Or 266, 276, 386 P2d 1 (1963) ("[T]he fact of dismissal by the court, without more, carries with it such a conclusion [that the lack of reasonable ground for prosecution may be implied] and the bare allegation that the complaint was dismissed is sufficient [to allege a favorable termination]."); *Portland Trailer & Equipment*, 182 Or App at 357 ("If the action was voluntarily terminated by the plaintiff, a finder of fact might determine that the termination was an admission that the claim lacked merit.").

By producing evidence that is susceptible to an inference that is contrary to the explanation in the affidavits of Rein and Pavlis regarding their beliefs, plaintiff created a genuine issue of material fact regarding the motivation for the dismissal that cannot be resolved on summary judgment. *See Downs v. Waremart, Inc.*, 137 Or App 119, 137, 903 P2d 888 (1995), *rev'd on other grounds*, 324 Or 307, 926 P2d 314 (1996) (where a plaintiff adduces evidence that places the credibility of the affiant at issue, the subjective belief of the affiant is not susceptible to summary judgment); *Taal v.*

---

[2] The record before us does not provide any evidence concerning the circumstances of the settlement negotiations or the reasons for leaving plaintiff out of those discussions.

*Union Pacific Railroad Co.*, 106 Or App 488, 494, 809 P2d 104 (1991) ("Credibility questions are for the fact finder; they are not for the court to resolve in dealing with contradictory evidence in a summary judgment setting."); *see also Porter v. Oba, Inc.*, 180 Or App 207, 216-17, 42 P3d 931, *rev den*, 334 Or 693 (2002) (where a trier of fact could infer from circumstances that the defendant fired the plaintiff for a purely personal reason, the defendant's testimony regarding his beliefs about the plaintiff's performance was adequately controverted for purposes of summary judgment).

■ This case provides yet another example of why the issue of "favorable termination" is not well suited to summary judgment. The motivations for dismissing a complaint are often multi-factored and can involve competing interests. That is particularly true in a case involving multiple defendants, where the claims against some defendants may be stronger than claims against others. Defendants ask us to focus on one fact—the economic motivation for entering into the settlement with plaintiffs' codefendants in the federal action—to the exclusion of all other circumstances surrounding the dismissal. The fact that the settlement of the federal action was economically beneficial to DeAbate does not, as a matter of law, mean that the dismissal was not favorable to plaintiff. In the abstract, the settlement of meritless claims generally is economically beneficial to the party asserting those claims; for example, a settlement could eliminate exposure that a party might have to claims for attorney fees under ORS 20.105. Thus, it is possible that a dismissal of the underlying action—where the plaintiff in that action believes that the claims are meritless and where a particular defendant is dismissed without paying anything toward the settlement—may still be a favorable termination as to the noncontributing defendant, regardless of the fact that the settlement is the only economically sound choice for the plaintiff.[3]

---

[3] Defendants interpret our opinion in *Perry I* too broadly in this respect. We did not hold that defendants would be entitled to judgment as a matter of law as long as the case was dismissed because continuation of the case would not have been financially prudent. That was only one inference that was available. It is correct that the lack of a favorable termination can be demonstrated by proving that the reason for the dismissal of a case is that settlement is financially prudent, assuming that the underlying action was initiated with probable cause and for a legitimate purpose. However, there are additional facts in this record that must be

Defendants make the related argument that, because it is undisputed that the terms of the settlement agreement *required* dismissal of the claims against plaintiff, the dismissal could not have been a "favorable termination" as a matter of law. It is well established that a termination resulting from a settlement among the parties is not a favorable termination as to any of those parties. *Gowin*, 237 Or at 279 ("[W]here the proceeding is terminated as the result of a compromise or settlement of the parties there is no such termination as may be availed of for the purpose of such an action." (Citations and internal quotation marks omitted.)). Traditionally, courts have reasoned either that the settlement is an admission of probable cause or that, where the plaintiff has consented to termination, he or she cannot later take advantage of it. *Gowin*, 237 Or at 280 (citing W. Prosser, *Prosser on Torts* 651 (2d ed 1955)). That reasoning, however, is not applicable where the plaintiff was not a party to the settlement.

Nevertheless, defendants contend that we should follow the holding in *Haight v. Handweiler*, 199 Cal App 3d 85, 85-89, 244 Cal Rptr 488, 489-90 (1988), that a termination that is required as a condition of settlement does not qualify as a favorable termination, regardless of whether the plaintiff consented to the settlement. In *Haight*, the plaintiff argued that, because he did not agree to the settlement that the defendants negotiated, his dismissal as a result of the settlement constituted a favorable termination. The California Court of Appeal disagreed: "[T]he focus is not on [the plaintiff's] opinion of his innocence, but on that of [the defendant], the dismissing party." *Id.* at 89, 244 Cal Rptr at 489. The court concluded that, because the defendant had received fair compensation from the plaintiff's codefendants in the underlying action, and because the dismissal was a condition of settlement of that action, "[s]uch a termination does not necessarily reflect [the defendant's] opinion that his action against

considered in concert with the fact that the settlement was economically beneficial to DeAbate to determine whether the circumstances surrounding the dismissal of the claims against plaintiff reflected adversely on the merits of those claims. In sum, the inquiry of whether a termination of an action is favorable to the plaintiff in this context is based on the totality of the circumstances, including facts that may also be probative of other elements of the tort of wrongful initiation of civil proceedings.

[the plaintiff] lacked merit and thus does not qualify as a favorable termination in the context of a malicious prosecution action." *Id.* at 89, 244 Cal Rptr at 490.

*Haight* has been followed in California, *see, e.g.,* *Villa v. Cole,* 4 Cal App 4th 1327, 6 Cal Rptr 2d 644 (1992), and by a federal district court in Hawaii, *Jaress & Leong v. Burt,* 150 F Supp 2d 1058 (D Hawaii 2001). In *Jaress & Leong,* the court concluded that the Supreme Court of Hawaii has in the past looked to California law and that the approach in *Haight* and *Villa* comports with Hawaii's public policy favoring settlement.[4] 150 F Supp at 1065-66. According to defendants Rein and his law firm, Oregon has a similar policy favoring settlement, and a contrary rule would "deter parties from entering into settlements calling for complete dismissal, out of fear that a non-settling defendant might later bring an action for wrongful civil proceedings."

We decline to adopt the *Haight* approach for purposes of Oregon common law. A hard and fast rule regarding dismissal of the underlying action as a required condition of settlement is not consistent with the fact-specific inquiry that Oregon courts use to determine whether a voluntary dismissal is a termination in the plaintiff's favor. Under the Oregon view, even if a settlement requires dismissal, the dismissal still may be favorable to the plaintiff—*i.e.*, reflect adversely on the merits of the action—if the defendant also believed that the claims were meritless when it dismissed them. Again, because the inference is available in this case that defendants believed the claims to be meritless when they filed and dismissed them, summary judgment was improper.[5]

---

[4] Ultimately, the court in *Jaress & Leong* denied the defendant's motion for summary judgment because, on the record before it, it was unclear whether dismissal of the plaintiff was actually a required condition of the settlement. 150 F Supp at 1065-66.

[5] We also disagree with the suggestion that, by refusing to hold as a matter of law that dismissal as a condition of settlement does not reflect adversely on the merits of the underlying action, we would somehow undermine Oregon's policy favoring dispute resolution. Parties do not open themselves to a claim for wrongful initiation of civil proceedings by settling claims; they do so by bringing them without probable cause and with malice. In this respect, the reasoning of the Oklahoma Supreme Court is instructive. *See Young v. First State Bank, Watonga,* 628 P2d 707, 710 (Ok 1981) (noting that the other elements required to prove malicious prosecution will prevent settlements involving multiple defendants from becoming a "breeding ground" for malicious prosecution actions). Moreover, the policy

For that reason, we reverse the judgment in favor of defendants and remand the case to the trial court.[6]

## B. *Ruling on motion to amend*

 Defendants cross-assign as error the trial court's ruling allowing plaintiff to file an amended complaint that includes a request for punitive damages. ORAP 5.57. They contend that plaintiff did not submit any evidence that would support an award of punitive damages.

 ORS 31.725(3)(a) provides that the court shall deny a motion to amend to add a request for punitive damages if:

> "The court determines that the affidavits and supporting documentation submitted by the party seeking punitive damages fail to set forth specific facts supported by admissible evidence adequate to avoid the granting of a motion for a directed verdict to the party opposing the motion on the issue of punitive damages in a trial of the matter[.]"

---

favoring settlement does not somehow immunize parties who otherwise bring actions without probable cause and with malice; otherwise, it would essentially license extortion, provided that an appropriate settlement could be worked with any one of a number of wrongfully named defendants. As the Oklahoma Supreme Court has observed in this context, "The mere fact that one defendant admits owing the money sued for in no way establishes that another defendant was not wrongfully sued." *Id.*

[6] In her concurring opinion, Judge Ortega states that, were she writing on a blank slate, she would hold that "a dismissal that is required under a settlement agreement cannot qualify as a favorable termination, even when the wrongful initiation plaintiff was not a participant in the settlement." 215 Or App at 135 (Ortega, J., concurring). That approach, however, would shift the focus of the element of a favorable termination improperly. Under Oregon law, the question is not whether the plaintiff in the underlying action obtained a favorable termination generally; the question is whether the plaintiff in the underlying action obtained a favorable termination *as to the plaintiff bringing the claim for wrongful initiation of civil proceedings.* Where, as in this case, the plaintiff did not participate in the settlement, there is no basis for treating the dismissal as if it were in fact a settlement as to him.

As Judge Ortega concedes, her proposed rule would leave certain wrongfully sued parties without a remedy. She reasons that "[t]he relatively small risk of meritless claims being brought against one defendant as part of a suit against multiple defendants is outweighed * * * by the chilling effect on settlements that may result from treating a settlement as a termination favorable to the defendant in an underlying action." 215 Or App at 136 (Ortega, J. concurring). We are not aware of any authority that would permit us, in a subset of wrongful initiation cases, to deprive a wrongfully sued party of a remedy simply because the plaintiff in the underlying action ultimately settled claims against other defendants. *See* Or Const, Art I, § 10.

That is, ORS 31.725(3)(a) requires a court to deny a motion to amend to add a request for punitive damages "only if the evidence submitted is not adequate to overcome an opposing motion for a directed verdict—*i.e.*, only if there is 'no evidence' from which the jury could find the facts necessary to establish an element of [the] plaintiffs' claim." *Bolt v. Influence, Inc.*, 333 Or 572, 580, 43 P3d 425 (2002). To recover punitive damages, a plaintiff must prove "that the party against whom punitive damages are sought has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others." ORS 31.730. In the context of a claim for wrongful initiation of civil proceedings, a plaintiff is required to present evidence that defendants "had a motive other than that of securing an adjudication of the claim on which the action was based." *Alvarez*, 234 Or at 266.

Plaintiff contends that he produced evidence from which "a jury could reasonably conclude that attorney defendants filed the [federal action] for an improper (malicious) purpose such as to harass [plaintiff] and coerce him into violation of an ethical canon in divulging confidences of his client." Plaintiff relies primarily on two portions of Rein's deposition testimony. In an unrelated case, Rein was asked to "summarize * * * the allegations in that case that you made against [plaintiff]." He responded:

"Sure. $150,000 that apparently he had arranged—the lawyer had arranged personally for the transfer of the funds from the person who had it in Connecticut into an account in Oregon. It got transferred to a general account. Then it got transferred into his client trust account.

"I gave him a copy of the TRO and the preliminary injunction from the Connecticut court. He refused to turn over the money. I asked him to reverse wire the funds so he wouldn't hold it. He refused to do that. I asked him not to do anything with the funds without giving me two hours' notice. He wouldn't do it. I asked him to give me some information as to the other missing funds. There was another $400,000. He wouldn't do it. I asked him if he had any information about anything else. He wouldn't disclose it.

"I asked him the whereabouts of [Obioha]. He wouldn't tell me. I asked him if he was working with Obioha as a lawyer or he was working with him. He wouldn't tell me. So we sued him."

In his deposition in this case, Rein testified:

"I came to the understanding that [plaintiff] neither could not or would not contribute financially to the settlement and, therefore, what * * * I ask in every case is, Well, what can you give otherwise. In this case, the only thing [plaintiff] had as value as far as I could see was information."

Considering those statements in the light most favorable to plaintiff, a jury could reasonably infer that Rein sued plaintiff because plaintiff refused to give him information about plaintiff's client, Obioha, and about the location of the missing funds, and that the action was brought for the purpose of extracting that information or punishing plaintiff for failing to disclose it.[7] Because the availability of that inference would be sufficient to survive a directed verdict on the issue of punitive damages as to Rein and his law firm, the trial court did not err in allowing plaintiff to file an amended complaint requesting punitive damages as to those defendants.

Plaintiff's request for punitive damages against Teicher and his law firm, Sussman, Shank, Wapnick, Caplan & Stiles, LLP, is a different matter. Plaintiff concedes that "Teicher seems to have played a less active role in drafting the complaint or amended complaint * * *." Plaintiff nonetheless relies on a portion of Teicher's deposition testimony in which Teicher acknowledges that, before pursuing a temporary restraining order regarding funds held by plaintiff, he did not "make any inquires to know—about [plaintiff]." When that testimony is read in context, it is clear that the testimony pertained to whether Teicher had hired a private

---

[7] Rein remonstrates that Obioha's whereabouts were not in fact confidential at that time and that plaintiff was aware that Obioha's whereabouts (in prison) were a matter of public record. The relevant question, however, is not what plaintiff knew, but what motivated Rein. There is no evidence that Rein was aware that the information he sought regarding plaintiff's client was publicly available. In fact, in the trial court, Rein's counsel stated that "[i]t was publicly known, although Mr. Rein—Mr. Teicher didn't know it."

investigator to find out whether plaintiff had ever had accusations of fraud levied against him. Plaintiff argues that, from Teicher's testimony, a jury could find that Teicher and his firm were "recklessly indifferent to his ethical obligation that he have some factual knowledge to support his allegations when he filed the Complaint against [plaintiff] and certified it under FRCP 11." We disagree. The fact that Teicher did not hire a private investigator or similarly investigate plaintiff before pursuing a temporary restraining order to protect funds held by plaintiff does not give rise to an inference of malice or recklessness. Because plaintiff did not produce any evidence that would support a punitive damages award against Teicher, the trial court erred in allowing plaintiff to amend his complaint to add a request for punitive damages as to Teicher and his law firm.

Judgment reversed and remanded; order allowing plaintiff to amend complaint to request punitive damages affirmed as to defendants Scott J. Rein and Dressler, Rein, Evans and Sestanovich, LLP, and reversed as to defendants Stuart I. Teicher and Sussman, Shank, Wapnick, Caplan & Stiles, LLP.

**ORTEGA, J.,** concurring.

Despite my disagreement with the result reached by the majority, I concur because I believe we are bound by our decision in *Perry v. Rein*, 187 Or App 572, 582-83, 71 P3d 81 (2003) (*Perry I*), in which we treated the disposition of the underlying claim against plaintiff as a voluntary dismissal, rather than a settlement, despite the fact that the dismissal occurred in the context of a settlement. As a matter of law, a settlement is not a favorable termination for purposes of a wrongful initiation action. *Gowin v. Heider*, 237 Or 266, 279, 386 P2d 1 (1963), *on reh'g*, 391 P2d 630 (1964). Nevertheless, in *Perry I*, we applied the rule that the voluntary dismissal of an underlying action is favorable to the plaintiff in a wrongful initiation action if it reflects adversely on the merits of the underlying action, a determination that requires examination of the circumstances resulting in termination. *Perry I*, 187 Or App at 582. We concluded that the summary judgment record permitted competing inferences about the motivation for dismissing the claim against plaintiff, thereby creating issues of fact about whether the underlying action

terminated in plaintiff's favor. *Id.* at 583. The majority opinion applies that same rule here.

If we were writing on a blank slate, however, I would hold as a matter of law that a dismissal that is required under a settlement agreement cannot qualify as a favorable termination, even when the wrongful initiation plaintiff was not a participant in the settlement. I write briefly to identify my concerns with the rule that a dismissal pursuant to a settlement such as the one at issue here may be treated as a favorable termination.

First, examining the motivation for a settlement conflicts with the strong policy in favor of settlements,[1] particularly as that policy is embodied in OEC 408(1):

"(a) Evidence of furnishing or offering or promising to furnish, or accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.

"(b) Evidence of conduct or statements made in compromise negotiations is likewise not admissible."[2]

The purpose of that rule is to promote the public policy favoring the settlement of disputes. *Cyberco Holdings, Inc. v. Con-Way Transportation*, 212 Or App 576, 589, 159 P3d 359 (2007). OEC 408 demonstrates the policy against the use of settlement agreements to prove the "invalidity of the

---

[1] *See, e.g.*, ORS 36.100 (declaring the policy for mediation "that, when two or more persons cannot settle a dispute directly between themselves, it is preferable that the disputants be encouraged and assisted to resolve their dispute with the assistance of a trusted and competent third party mediator, whenever possible, rather than the dispute remaining unresolved or resulting in litigation"); *see also Davis v. Brown*, 280 Or 561, 564, 571 P2d 912 (1977) (observing that "settlement agreements are favored by the law").

[2] OEC 408(2) goes on to provide circumstances in which such evidence may nevertheless be admissible:

"(a) Subsection (1) of this section does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations.

"(b) Subsection (1) of this section also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."

claim"—the very fact at issue in a wrongful initiation of civil proceedings claim. *See* Charles Alan Wright and Kenneth W. Graham, Jr., 23 *Federal Practice and Procedure* § 5308, 244 (1980) ("[W]here in an action for abuse of process, the present plaintiff uses evidence of an offer by the present defendant to settle the prior action for a pittance to show that the defendant had brought the prior action in bad faith, the jury must make an inference as to the offeror's belief in the invalidity of his claim in order to reach the desired conclusion. Therefore, [federal] Rule 408 would prohibit the introduction of compromise evidence for this purpose.").

It is theoretically possible, unfortunately, for a plaintiff in an underlying action to name some defendants—despite the lack of meritorious claims against them—and then rely on settlement with all defendants, including other, more appropriate defendants, to protect the plaintiff from future claims for wrongful use of civil proceedings. As a practical matter, however, that risk is likely to be low, given that attorneys are subject to sanctions for filing unfounded claims and that, normally, settling defendants will not require dismissal of claims against other, nonsettling defendants. The relatively small risk of meritless claims being brought against one defendant as part of a suit against multiple defendants is outweighed, in my view, by the chilling effect on settlements that may result from treating a settlement as a termination favorable to the defendant in an underlying action.

Second, I note the danger of creating conflicts of interest between attorneys and their clients in situations such as this, where a settlement of the underlying action is in the client's economic interest but may expose her attorneys to later claims of wrongful initiation. In such situations, the client is protected from any wrongful initiation claim by reliance on the advice of counsel. *Roop v. Parker Northwest Paving Co.*, 194 Or App 219, 238, 94 P3d 885 (2004), *rev den*, 338 Or 374 (2005) ("Evidence that the underlying action was undertaken upon the advice of counsel, relied on in good faith, that the action had a reasonable probability of success is enough to establish probable cause." (Citation omitted.)). The attorneys, however, have no such protection when they recommend settlement. If a settlement is or may be treated

as a termination favorable to the plaintiff in a later wrongful initiation action, then the settlement that protects the client's interests is contrary to the attorneys' interests.

In short, although I concur with the majority's application of our rule from *Perry I*, I do so with significant misgivings about the rule itself.